UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JEAN F. SIMPSON, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 3:13-cv-01177 |
| | ) Judge Sharp |
| THE VANDERBILT UNIVERSITY, | ) Magistrate Judge Holmes |
| | ) |
| Defendant. | ) |

**MEMORANDUM**

Plaintiff Jean F. Simpson brought this action for wrongful termination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e-1 *et seq.* ("Title VII") and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-301 *et seq.* ("THRA"). Defendant Vanderbilt University ("Defendant" or "Vanderbilt") has countersued for breach of contract. Pending before the Court are the Parties' cross motions for summary judgment. For the reasons set forth below, the Court will grant summary judgment in Defendant's favor on Plaintiff's discrimination and retaliation claims and will dismiss the state law counterclaim.

### I.  Factual & Procedural Background

Unless stated otherwise, the following facts are drawn from the parties' statements of undisputed facts and the responses thereto.[1] Plaintiff is a doctor specializing in breast pathology. She worked for Defendant as part of the Vanderbilt University School of Medicine ("VUSM") and the Vanderbilt Medical Group ("VMG") from June 1, 1997 until her termination on October 24, 2013. At the time of her termination, Plaintiff held a full-time faculty appointment as a professor in the Division of Anatomic Pathology ("Pathology Division"). In that role, Plaintiff

---

[1] The various factual statements and responses are available at Docket Nos. 124, 146, 152, 160, 179, 180, 189, 190, 212, 222, 226, and 227.

1

examined, interpreted, and rendered reports on pathology specimens in an effort to identify and diagnose diseases, such as cancers.

When Plaintiff started her employment, the Pathology Division had a dedicated breast consult practice ("Page Breast Service"), which was started by Dr. David Page in the 1980s. The Page Breast Service allowed outside pathologists or physicians, who were unaffiliated with Vanderbilt ("referral sources") to seek assistance with pathology for breast tissue. Sometimes the referral sources sought a second opinion, but the primary purpose of these outside consultations was typically to assist the referral source in arriving at the correct diagnosis in the first instance. Dr. Page and those who worked on his service would provide the requested diagnostic assistance to referral sources within twenty-four hours. Dr. Page trained Plaintiff in his breast tissue diagnostic methods and she worked on his service until he resigned in 2010. In the last five years of her employment with Defendant, Plaintiff spent approximately one hour a day analyzing breast tissue samples. She spent the rest of her time doing other surgical pathology work, such as autopsy pathology and cystopathy, teaching residents, attending conferences, preparing research papers, and delivering lectures.

In July 2011, Plaintiff learned that Vanderbilt was going to reorganize the Pathology Division to eliminate the Page Breast Service. The reorganization occurred in July 2012. After that point, breast tissue specimens were processed through general surgical pathology, rather than having a separate process. Like other specimens sent to the Pathology Division, breast tissue specimens were logged in and assigned to a resident or pathology assistant to prepare the tissue for examination. From there, samples were reviewed by a resident, who would formulate a diagnosis with the attending pathologist. Only several of the pathologists were trained by Dr.

Page in the analysis of breast tissue. The reorganization impeded pathologists' abilities to respond to referral sources within twenty-four hours.

Plaintiff found the elimination of the Page Breast Service to be concerning, both because of the delays attendant to processing breast tissue through general surgical pathology and because Dr. Page had not trained all of the pathologists to analyze breast tissue.

Soon after she learned of the reorganization but prior to its occurrence, Plaintiff obtained a charter for a corporation, Breast Pathology Consultants, Inc. ("BPC"). Plaintiff also leased office space for BPC in a building located near the Vanderbilt campus on September 28, 2011. The website for BPC described its services as follows:

> Breast Pathology Consultants, Inc. offers second opinion diagnostic pathology services for pathologists, clinicians, and patients. Through years of experience and by seeing tens of thousands of cases, we can give guidance to pathologists for cases that are diagnostically challenging. For the clinician, we can clarify the pathology findings so that treatment decisions can be formulated. And for patients, we can help allay concerns about the correct diagnosis being made, so that appropriate treatment can be planned. Our services, geared for pathologists and clinicians, benefit patients by providing accurate and timely diagnoses, thus reducing the emotional distress caused by waiting. Once a diagnosis is established, management decisions can be formulated.

(Docket No. 13-4). In early 2012, Plaintiff began calling pathologists for whom she had provided consultation on breast cancer cases. She also sent letters to several hundred pathologists who had submitted consult cases to the Page Breast Service. The letters, sent in February 2012, informed the referral sources of the reorganization and offered Plaintiff's diagnostic services through BPC as an alternative. Plaintiff's letters expressed her concerns that there would be inconsistent diagnostic approaches without the dedicated Page Breast Service and that the turnaround time would now be longer.

After starting BPC, Plaintiff remained a Vanderbilt employee. She continued to examine breast tissue samples for both internal physicians and external referral sources. Plaintiff also

3

began diagnostic breast pathology consults on behalf of BPC in April 2012. Apart from the difference in turnaround time, the work Plaintiff performed through Vanderbilt was identical to the work she performed through BPC.[2] Plaintiff did not ask permission to establish and run BPC, nor did she discuss her new business venture with anyone at Vanderbilt. Plaintiff continued to provide services through BPC throughout the rest of her tenure at Vanderbilt. Between February 2012 and October 2013, Plaintiff collected fees through BPC in the total amount of $244,146.84.

In the summer of 2012, Vanderbilt's Compliance Office received an anonymous tip that through BPC, Plaintiff was engaging in the practice of anatomical pathology outside of her employment. Around the same time, Vanderbilt's Pathology Division received certain tissue sample deliveries that were addressed to Plaintiff at BPC. An internet search showed Plaintiff as the Registered Agent for BPC. On August 2, 2012, after learning all of this information, Drs. Samuel A. Santoro, the Chair of the Department of Pathology, Microbiology, and Immunology at Vanderbilt, and Michael Laposata, Vice-Chair of the Department, met with Plaintiff. Drs. Santoro and Laposata informed Plaintiff that they were aware of her activity through BPC and stated that such activity was a violation of Vanderbilt's Conflict of Interest Policy ("COIP"), the VMG By-Laws, and the VMG Participation Agreement.[3] They also noted that Plaintiff had not included her work with BPC on her 2012 Conflict of Interest Disclosure, which she filed on May 16, 2012. After the meeting, Plaintiff and Dr. Santoro corresponded about their discussions, and

---

[2] Plaintiff argues that the work at BPC was different from her work at Vanderbilt because of the faster turnaround time and because she was able to provide superior care and consistency. (Docket No. 188 at 3-4). Even if such differences in care did exist, they do not affect her claims of discrimination or retaliation.

[3] These policy documents are included in the record at Docket Nos. 25-1 to 25-3. Plaintiff signed the Participation Agreement, sometimes referred to as the "Provider Agreement," by which she acknowledged and agreed to be bound by the By-Laws and agreed to endorse over to Defendant all fees that she received for professional services.

4

Plaintiff opined that her activities were not a conflict of interest because BPC offered a twenty-four hour turnaround while Vanderbilt no longer did.

On October 12, 2012, Dr. Santoro sent a follow-up letter to Plaintiff in which he informed Plaintiff that she needed to cease her work through BPC in order to comply with the VMG Participation Agreement and By-Laws. Without responding to Dr. Santoro's letter, Plaintiff then amended her conflict of interest disclosure to reflect her work with BPC.

Plaintiff's counsel, Richard Braun, apparently met with an attorney in the Deputy General Counsel's office, Julia Morris, on October 25, 2012, to discuss Plaintiff's belief that she was being discriminated against based on her gender. On October 26, 2012, Dr. Santoro, along with Dr. David S. Raiford, Associate Dean of Faculty Affairs, advised Plaintiff that her work with BPC and her work at Vanderbilt were incompatible. The letter asked Plaintiff to respond in writing with her plan to resolve the conflict of interest by October 30, 2012.

Plaintiff responded directly to Drs. Santoro and Raiford to inform them that her attorney would be in contact with Ms. Morris. She did not mention the attorneys' previous meeting or gender discrimination in her response. Mr. Braun reached out to Ms. Morris on October 30, 2012 to inform them that, given the impasse on Plaintiff's work with BPC, Plaintiff would be filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC Charge"). After receiving a copy of Plaintiff's EEOC Charge in February 2012, Vanderbilt conducted an internal investigation through its Equal Opportunity, Affirmative Action, and Disability ("EAD") office. In a report dated March 4, 2013, the EAD stated a finding of no merit to Plaintiff's complaint of discrimination.

It appears that business proceeded as usual for several months. On June 27, 2013, Dr. Jeffrey Balser, Dean of the School of Medicine, notified Plaintiff that he was considering the

5

possibility of disciplinary action against her for her continued work through BPC. Dr. Balser again noted that Plaintiff's outside consulting through BPC appeared to violate the VMG Participation Agreement and By-Laws, as well as the COIP. In a response dated July 15, 2013, Plaintiff denied that her activities competed with Vanderbilt and pointed to Dr. Page's previous consulting work as an example of a male pathologist who was allowed to maintain an outside practice. Dr. Balser then appointed a faculty committee, comprised of two female and one male clinical physicians, to investigate the allegations against Plaintiff. Plaintiff declined the committee's request to meet as part of their investigation.

The investigative committee reported its findings on September 16, 2013. The investigation yielded the following results:

> The Committee finds that Dr. Simpson's violations of the Vanderbilt University Conflict of Interest and Commitment policy, the VMG By-laws and the VMG Provider Agreement, and her actions subsequent to that notification constitute neglect of duty. We believe this is a serious violation and warrants termination for cause and surrender of funds accrued from this outside business, Breast Pathology Consultants, Inc. (breastconsults.com). We arrived at this conclusion based on careful consideration of evidence reviewed and interpretation of the VMG By-laws and VMG Provider Agreement.

Plaintiff responded to the report in writing on October 2, 2013, noting her disagreement with some of the statements and findings. On October 7, 2013, the investigative committee wrote to Dr. Balser to say that Plaintiff's objections were immaterial to their decision and that their recommendation remained unchanged.

The Parties, through their counsel, then engaged in what appear to be productive yet unsuccessful settlement communications. (Docket Nos. 225-1 to 225-7). Plaintiff was given the option of resigning in lieu of termination, conditioned upon her payment to Defendant of all monies received through BPC during employment with Vanderbilt. (Docket no. 225-3).

Plaintiff ultimately rejected this offer as unreasonable. (Docket No. 225-7). Soon thereafter, on October 24, 2013, Dr. Balser terminated Plaintiff for cause.

The EEOC dismissed Plaintiff's charge of discrimination and she initiated this litigation shortly thereafter. Plaintiff asserts that male employees who engaged in outside consulting were not terminated from their employment and that this alleged disparity constitutes gender-based discrimination in violation of Title VII and the THRA. Plaintiff also alleges that Defendant only took issue with her work through BPC *after* she raised, through her attorney, complaints of gender discrimination. Accordingly, she argues that the investigation and her subsequent termination were retaliatory. Defendant argues that Plaintiff violated that VMG Participation Agreement and By-Laws, as well as the COIP, and that these violations constitute actionable breaches of contract. The Court finds that Defendant is entitled to summary judgment on Plaintiff's employment claims and declines to exercise continued jurisdiction over Defendant's pendant state law claim for breach of contract. Accordingly this matter will be dismissed.

## II. Legal Analysis

A. The Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Canderm Pharmacal, Ltd. v. Elder Pharms., Inc., 862 F.2d 597, 601 (6th Cir. 1988). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party, and the "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322

B. Plaintiff's Wrongful Termination Claim

Plaintiff claims that her October 2013 termination was the result of gender discrimination in violation of Title VII and the THRA.[4] More specifically, she claims that male employees were either allowed to engage in outside practice or were not disciplined as harshly for doing so. Plaintiff believes that she was terminated for the same conduct that Vanderbilt sanctioned among its male doctors.

A plaintiff may prove that she was subject to disparate treatment based on gender in violation of Title VII using either direct or circumstantial evidence. Where, as here, there is no direct evidence of discrimination, the plaintiff's circumstantial evidence is analyzed under the familiar burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Clay v. United Parcel Serv., Inc., 501 F.3d 695, 703 (6th Cir. 2007). Under the McDonnell Douglas framework for discrimination claims, a Title

---

[4] Claims under the THRA are analyzed under the same framework as those based upon Title VII. Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 347 (6th Cir. 2012); Howington v. Quality Restaurant Concepts, LLC, 298 F. App'x. 436 n.1 (6th Cir. 2008). Accordingly, if Plaintiff's claims fail under Title VII they also fail under the THRA.

8

VII plaintiff must first make out a prima facie case of discrimination by showing "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." Peltier v. United States, 388 F.3d 984, 987 (6th Cir. 2004) (citing Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995)). After the plaintiff has made out a prima facie case of discrimination, the employer must present a legitimate, nondiscriminatory reason for the termination. Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009). The burden of production then shifts back to the plaintiff to show that the employer's proffered nondiscriminatory reason was pretext. Id.

The Parties agree that Plaintiff is a member of a protected group who was subject to an adverse employment action despite being qualified for the position. (Docket No. 145 at 17). She has not been replaced by a male. The issue, then, is whether Plaintiff has demonstrated that a similarly-situated male received more favorable treatment. Indeed, the gravamen of Plaintiff's argument is that male doctors who earned income from outside patient care did not face such severe discipline. The facts presented do not bear out this argument. Even if they did, Plaintiff cannot rebut Defendant's legitimate explanation for her termination.

### 1. *Plaintiff Has Not Identified a Similarly Situated Male Comparator*

In determining whether any males were similarly situated to Plaintiff, it is useful to begin by defining Plaintiff's situation. She founded and operated a profitable side business providing precisely the same professional services she rendered in her role as a Vanderbilt employee.[5] Plaintiff did not disclose her business even though such disclosure was called for under

---

[5] Again, the difference in timing and quality of Plaintiff's services through BPC and her services through Vanderbilt do not change the fact that the substance of her work at both locations was fundamentally the same.

Defendant's policies. When confronted with the fact that this conduct likely violated multiple policies, she refused to abate her side business or to turn over any fees to Defendant. Plaintiff also declined to participate in the disciplinary investigation into her conduct. Defendant terminated her employment after more than a year of back-and-forth about this issue, a period of time during which Plaintiff made no efforts to bring her conduct into compliance with Vanderbilt's policies. With those undisputed facts in mind, the Court turns to whether Plaintiff can show that a similarly situated male received more favorable treatment.

To prevail on this prong of her prima facie case, Plaintiff must identify at least one male comparator who is similarly situated to her in all relevant respects. Gragg v. Somerset Tech. Coll., 373 F.3d 763, 768 (6th Cir. 2004). In the context of a wrongful termination claim, the Sixth Circuit has described a person who is similarly situated as someone who has "been subject to the same standards and has engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).

Plaintiff advances a number of males as similarly situated individuals. She names four male physicians who performed work through the online platform Consulting MD. However, Plaintiff does not dispute Defendant's statement that "all four of those individuals had discontinued their participation when confronted and paid to Vanderbilt any fees received by them through that site." (Docket No. 160 at 24). Their conduct and mitigation renders these four doctors dissimilar to Plaintiff. Several doctors have profiles on another online platform, WebMD. However, there is no evidence that those doctors with WebMD profiles actually performed any professional services through the website or received any fees. Mere presence on the site does not liken them to Plaintiff.

Plaintiff also points to male doctors who were involved with the outside organization Best Doctors. For example, Plaintiff identifies Dr. Laposata, whose work through Best Doctors allowed him to collect $3,150.00 for professional services. However, after this work came to light, Dr. Laposata endorsed the entirety of fees received through Best Doctors to Vanderbilt. His conduct—namely, his efforts to remedy the alleged violations—differed materially from Plaintiff's handling of the same alleged violations. Moreover, he did not start and operate a separate business entity, but rather continued participating in a service that he had been involved with prior to the start of his employment with Defendant.

Nine other doctors employed by Defendant also had profiles on the Best Doctors website and received fees for professional services rendered through the organization. When this information came to light, Defendant, via Dr. Raiford, instructed the physicians to discontinue their work through Best Doctors and to turn over all fees received for the same. Unlike Plaintiff, eight of the nine doctors complied with Dr. Raiford's directives and have been cooperating with Defendant to rectify the problem.[6] And again, they merely participated in consulting services offered by nationwide organization; they did not start their own business in the same locale.

The ninth doctor, Dr. Peter Donofrio, comes the closest to being similarly situated to Plaintiff. Dr. Donofrio discontinued his work with Best Doctors at the direction of Defendant in 2011, but then later resumed it and failed to disclose it on his conflict of interest form. This came to light during discovery, and when Defendant learned of the resumption, Dr. Donofrio was subject to the same type of internal investigation to which Plaintiff was subject. Dr. Donofrio, however, participated in the investigation and made plans with Dr. Raiford to repay all fees received through Best Doctors to Vanderbilt. (Docket No. 93-3). Because of his

---

[6] Plaintiff takes issue with the fact that some of the money these doctors earned through Best Doctors will ultimately be returned to them as part of the VMG fee-sharing arrangement. The Court does not find this fact to be material, as it seems more attributable to these physicians' ready cooperation with Defendant than it is to their gender.

11

cooperation, the investigative committee recommended a letter of reprimand. (Docket No. 93-2). Dr. Raiford imposed a steeper punishment: in addition to the repayment of fees and letter of reprimand, Dr. Raiford placed Dr. Donofrio on probation for a period of two years. (Docket No. 93-3). Dr. Donofrio's situation most resembles that of Plaintiff because, like her, he engaged outside practice even after being made aware that doing so violated some of Defendant's policies. Yet his situation is dissimilar from Plaintiff's insofar as he ceased the problematic conduct, cooperated with the ensuing investigation and set up a repayment plan.

In her supplemental briefing, Plaintiff identifies several other male doctors who had approval from VMG to participate in private practice. All of these doctors were part-time employees of Defendant and/or were transitioning out of employment with VMG and into private practice. (Docket No. 227 at 4-7). Plaintiff now asserts that she, too, was transitioning into retirement. Apart from a self-serving statement made eighteen months into the litigation and thirty months after Defendant first approached Plaintiff about BPC, she presents no evidence of any retirement plans or Defendant's awareness thereof. Regardless, Vanderbilt's policies specifically provide for private practice arrangements in certain circumstances. All of the individuals named by Plaintiff engaged in private practice in compliance with Vanderbilt policies and did so with the approval of VMG. Id. Therefore there exists a crucial difference between those doctors and Plaintiff: she was a full-time employee who engaged in private practice without permission and in a way that violated policies. Notably, Defendant has presented undisputed evidence that women who were part-time employees of Vanderbilt and/or were transitioning out of their employment relationships also received approval for private practice arrangements. Id. at 5.

Finally, Plaintiff refers to Dr. Page as a male comparator who she alleges received more favorable treatment after violating Defendant's policies because he was offered the option of resigning. Dr. Page was apparently aware that some of his conduct made him vulnerable to disciplinary proceedings and resigned prior to the initiation of an investigation. Dr. Page does not constitute a viable comparator because the reasons for the potential disciplinary action against him were substantially different. Moreover, while he did engage in outside provision of professional services, it is undisputed that he did so openly and with Vanderbilt's permission. He, too, referred the proceeds from his outside practice back to Vanderbilt. Finally, Plaintiff received but rejected an offer of resignation, even if it came later than she would have preferred.

In sum, none of the male employees that Plaintiff refers to engaged in the same conduct that she did: founding a geographically proximate direct competitor. Those doctors who worked with other local entities had permission to do so and did not violate Defendant's policies. Those doctors who improperly provided professional services through broader organizations cooperated with Defendant to remedy any offenses. Unlike Plaintiff, all of those doctors mitigated their problematic behavior by ceasing it and endorsing all monies over to Vanderbilt. These distinctions prevent them from serving as comparators for the purpose of Plaintiff's prima facie case. Because she has not named a single individual who is actually similarly situated to herself, Plaintiff has failed to establish the fourth prong of her prima facie case and therefore cannot carry her burden under McDonnell Douglas.

2. *Plaintiff Has Not Shown Pretext*

Even if Plaintiff had carried her burden and demonstrated a prima facie case, she would still be unable to prove that her termination was pretext for discrimination. A plaintiff can show pretext "in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the

proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009) (citing Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 460 (6th Cir. 2004)). To carry her burden at this stage, Plaintiff "must produce sufficient evidence from which a jury could reasonably reject [Defendant's] explanation of why it fired her." Id. (citations omitted).

Vanderbilt asserts that it terminated Plaintiff's employment because her establishment of BPC violated university policies and she did not take any action to remedy these violations. The evidence on the record confirms Plaintiff's work with BPC violated the VMG By-Laws and Participation Agreement. Regarding Defendant's motivation, the case of Dr. Donofrio is instructive. There, Defendant reacted to the news of violations of the By-Laws, Participation Agreement, and COIP in precisely the same manner: by sending a letter informing the physician of the seriousness of the conduct; impaneling an investigative committee; and taking disciplinary steps after receiving the results of the investigation. The outcome was different because of Dr. Donofrio's cooperation and efforts to mitigate his conduct. These parallel disciplinary processes underscore the gravity of Plaintiff's offense and confirm that all such offenses gave rise to the possibility of major disciplinary action. The discipline to which Dr. Donofrio was subject provides a helpful external check on Defendant's explanation for Plaintiff's termination and, in so doing, belies any allegations of pretext. Put another way, Defendant's explanation for Plaintiff's termination justifies the decision.

In short, Plaintiff cannot shoulder her burden in the first instance because she cannot identify a similarly situated male employee who received more favorable treatment. Even if she had made that showing, her wrongful termination claim would fail because she cannot rebut

Defendant's legitimate explanation for the termination decision. Accordingly, her claims of discrimination fail under both Title VII and the THRA.

   *3. Plaintiff's References to Salary Disparities*

In her supplemental briefing, filed eighteen months into the litigation, Plaintiff spends several pages addressing alleged pay disparities based on gender. The Court finds these allegations puzzling, as Plaintiff did not assert a pay discrimination claim, nor has she sought leave to amend her complaint in order to do so. Additionally, as Defendant points out, such a claim would be outside the scope of Plaintiff's EEOC charge and therefore may not be properly administratively exhausted. Accordingly, the Court declines to address the pay disparity allegations.

C. Plaintiff's Retaliation Claim

Plaintiff also alleges that Defendant instigated the disciplinary process in retaliation for her raising, through her attorney, complaints of gender discrimination. She also argues that she was terminated for filing this lawsuit. A retaliation claim, like Plaintiff's other discrimination claims, is subject to the McDonnell Douglas burden-shifting framework articulated above. Evans v. Prospect Airport Servs., Inc., 286 F. App'x 889, 894 (6th Cir. 2008). To establish a prima facie case of retaliation under Title VII, an employee must show "(1) that she engaged in activity protected by Title VII; (2) that her exercise of such protected activity was known by the defendant-employer; (3) that the employer thereafter took an action that was materially adverse to the employee; and (4) that a causal connection existed between the protected activity and the materially adverse action." Barrett v. Whirlpool Corp., 556 F.3d 502, 516 (6th Cir. 2009).

The first three elements are again satisfied: Plaintiff engaged in the protected activity of complaining about gender discrimination, both via the EEOC and by filing this lawsuit, and this

activity was known to Defendant. Defendant launched a formal investigation into Plaintiff's conduct at some point after learning of her gender complaints and terminated Plaintiff's employment on the same day that she filed this lawsuit. The remaining issue is whether Plaintiff presented sufficient evidence for a rational jury to infer a causal connection between her complaints and the adverse employment actions.

Plaintiff rests her argument regarding causation entirely upon temporal proximity. More specifically, she alleges that the quick turnaround between her EEOC charge and the subsequent investigation, and between her filing of her complaint and subsequent termination show that her protected activity caused the adverse actions. Plaintiff is correct that the Sixth Circuit has endorsed the proposition that, in certain circumstances, temporal proximity may be sufficient to show causation. Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 524 (6th Cir. 2008) (collecting cases). However, a close review of the record reveals that no such circumstances are present here.

First, Plaintiff had notice of the looming disciplinary investigation prior to filing an EEOC Charge. Dr. Santoro first met with Plaintiff and discussed the gravity of her actions on August 2, 2012, over two months before she ever mentioned gender discrimination. He followed up with her in person and in writing on October 12, 2012, at which time Plaintiff was instructed to immediately cease her extracurricular practice. (Docket No. 13-8). Dr. Santoro's letter, sent two weeks before any mention of gender discrimination, expressly states that if Plaintiff does not cease her practice through BPC, he "will initiate disciplinary action" against her "that may include termination of [her] faculty appointment." Id. Plaintiff did not cease her extracurricular practice, either in response to that communication or at any point during the remainder of her employment with Defendant. It is disingenuous at best to assert that the EEOC charge predated

16

the disciplinary action when Plaintiff was clearly on notice prior to complaining. The timeline does not support the element of causation.

Second, Plaintiff's termination was the result of failed negotiations, not her decision to file a lawsuit. The undisputed evidence on the record shows that Plaintiff was informed, via email to her counsel on October 15, 2013, that Dr. Balser would likely adopt the recommendation of the investigative committee, termination, and would probably make a decision prior to expiration of her appointment on October 31, 2013. (Docket no. 225-3). In that same email, Plaintiff was advised that she could avoid this result by resigning and paying Vanderbilt money received for the services provided in violation of policy. Id. After a week of silence from Plaintiff, counsel for Vanderbilt followed up with her attorney and the two attorneys exchanged several emails on October 22 and 23, 2013. (Docket Nos. 225-4 to 225-6). It was only after Plaintiff expressly rejected Defendant's offer of resignation that Dr. Balser submitted her termination letter. (Docket No. 4-3). This chain of events indicates that Plaintiff's termination was the predetermined outcome should she turn down the resignation offer. The impetus for notifying her of the termination decision was not protected activity, but rather her rejection of Vanderbilt's efforts to reach a resolution short of litigation. Once again, the temporal proximity does not support the element of causation.

Plaintiff advances no other arguments regarding causation. Even if she did, the record conclusively establishes that it was Plaintiff's activity with BPC,—not her complaints of discrimination—that prompted Defendant to take formal action against her. She has therefore failed to make out a prima facie case of retaliation. Moreover, the extensive documentary evidence submitted by Defendant prevents Plaintiff from demonstrating pretext. Because no

reasonable jury could find that the evidence on the record is sufficient to support a claim of retaliation, Plaintiff's claim must fail.

D. Defendant's Counterclaim for Breach of Contract

When a federal court has dismissed the claims over which it had original jurisdiction, it may decline to exercise supplemental jurisdiction over the remaining claims under state law. See 28 U.S.C. 1367(c)(3). "It is well-established within the Sixth Circuit that a court's dismissal of the claims providing for original jurisdiction at an early stage (i.e., as here, on summary judgment) strongly weighs in favor of dismissing of the remaining state-law claims." Stewart v. FirstEnergy Corp., No. 105-CV-00022, 2007 WL 43645, at *1 (N.D. Ohio Jan. 5, 2007) (citation omitted). See also Musson Theatrical Corp. v. Fed. Express Corp., 89 F.3d 1244, 1254-55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed."). This Court declines to continue to exercise jurisdiction over Defendant's state law counterclaim for breach of contract and will dismiss it without prejudice. In so doing, the Court does away with the only remaining claim and ends the litigation.

III. **Conclusion**

Plaintiff's Title VII and THRA claims for wrongful termination fail because she cannot identify a similarly situated male comparator. Her retaliation claims fail because she cannot show that the adverse employment actions she suffered were caused by her protected activity. On neither claim can she show pretext. Instead, the record confirms that Plaintiff was subject to an investigation and eventually terminated because she refused to remedy her problematic conduct by either stopping her private practice or endorsing the money she received via BPC over to Vanderbilt. Plaintiff's claims therefore fail and this Court declines to exercise continued

jurisdiction over Defendant's counterclaim for breach of contract. Accordingly, this action will be dismissed.

A separate order shall enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE